Filed 7/8/14  P. v. Perez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>ANGEL ALBERTO CRUZ PEREZ,<br><br>　　Defendant and Appellant. | G048461<br><br>(Super. Ct. No. 11CF3062)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard Toohey, Judge.  Affirmed.

Kurt David Hermansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

\*　　　　　\*　　　　　\*

While intoxicated, Angel Alberto Cruz Perez ran a stop sign and drove his Toyota 4-Runner into Yesenia Romero and her two young children, Darwin and Gloria. Darwin died at the scene. Perez fled from it. A jury convicted Perez, as charged, of vehicular manslaughter with gross negligence while intoxicated (Pen. Code, § 191.5, subd. (a)) and of four other counts, and found true allegations that he proximately caused bodily injury or death to more than one victim (Veh. Code, § 23558) and that he fled the scene (Veh. Code, § 20001, subd. (c)).[1] The trial court sentenced Perez to a total of 16 years in prison.[2]

We affirm. We conclude (1) the trial court did not err or violate Perez's constitutional rights by receiving in evidence statements made by Perez during a field sobriety test conducted without warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and any error was harmless; (2) Perez's trial counsel was not ineffective by failing to object to admission of Perez's statements made during a jailhouse police interview after a *Miranda* warning was given; (3) Perez's trial counsel was not ineffective by failing to object to certain hearsay statements because Perez suffered no

---

[1] The jury convicted Perez of five counts: count 1—vehicular manslaughter with gross negligence while intoxicated (Pen. Code, § 191.5, subd. (a)); count 2—driving under the influence causing bodily injury (Veh. Code, § 23153, subd. (a)); count 3—driving with a blood alcohol level of 0.08 percent or more causing bodily injury (*id.*, § 23153, subd. (b)); count 4—hit and run with permanent injury or death (*id.*, § 20001, subds. (a), (b)(2)); and count 5—driving without a valid license (*id.*, § 12500, subd. (a)).

As to count 1, the jury found true allegations that Perez proximately caused bodily injury or death to more than one victim (Veh. Code, § 23558) and that Perez fled the scene (*id.*, § 20001, subd. (c)). As to counts 2 and 3, the jury found true allegations that Perez personally inflicted great bodily injury on a child under the age of five (*id.*, § 12022.7, subd. (d)).

[2] The trial court imposed a 10-year sentence on count 1, a consecutive 1-year sentence on the Vehicle Code section 23558 allegation, and a consecutive 5-year sentence on the Vehicle Code section 20001, subdivision (c) allegation.

prejudice from their admission; (4) there was no cumulative error; and (5) Perez's absence from the readback of witness testimony during jury deliberations was harmless.

FACTS

On November 9, 2011, Perez and his friend, Eduardo Huerta, went to the Mariscos Ensenada restaurant in Santa Ana, where they drank four six-bottle buckets of Corona beer and became visibly drunk. Adriana Montoya, a waitress at the restaurant, saw Perez and Huerta leave the restaurant at about 6:30 p.m., get into a vehicle, and drive away. Perez, whom Montoya described as the shorter of the two, was in the driver's seat. Montoya mistakenly identified Perez's Toyota 4-Runner as a white Chevy pickup truck.

Soon after Perez drove off, Montoya heard the sound of tires screeching, and Nicolas Bernal, a restaurant customer, heard a woman shouting in Spanish. Nobody other than Perez and Huerta had left the restaurant. Bernal walked outside and saw a woman holding a young boy. A young girl was trying to hold onto the woman. As Bernal approached the woman, he could see that the boy she was holding was unconscious and had blood on his head.

The woman, Yesenia Romero, had been walking down Fifth Street, holding the hand of her son, Darwin (who was two years eight months old) while carrying her daughter, Gloria (who was one year 10 months old). Upon reaching the intersection of Fifth Street and Bewley Street, Romero checked for cars, then proceeded to cross the street with Darwin and Gloria. A stop sign required vehicles travelling along Bewley Street to stop before crossing Fifth Street.

As Romero, Darwin, and Gloria crossed the street, Perez pulled out of the Mariscos Ensenada parking lot and onto Bewley Street, ran the stop sign, and struck Romero and her two children. Romero lost her grip on Darwin's hand. With Gloria in her arms, Romero was thrust onto the hood of Perez's 4-Runner, from where she could see the driver and the passenger inside. She later described the driver as light-skinned

3

with a mole-like spot on the side of his face, between his lip and his nose. Perez's booking photograph showed that he is light-skinned and has a small mole between his lip and his nose. Huerta testified he was in the passenger seat of the 4-Runner on the ride from the restaurant.

Perez turned the 4-Runner left onto Fifth Street and fled the scene. Romero fell off the hood and scraped her knees in the fall. Bystanders rushed to Romero and her children to provide assistance. Miraculously, Gloria was not injured. Tragically, Darwin died.

When police officers arrived at the scene, a witness, Henri Chavez, provided them the 4-Runner's license plate number. A records check revealed Perez was the registered owner and gave his address at a mobilehome park.

Santa Ana Police Officer Rick Marckstadt, who had been dispatched to the address gleaned from the records check, arrived at 6:39 p.m. and found Perez's 4-Runner parked in the driveway. When Marckstadt saw the reverse light on the 4-Runner come on, he pulled his patrol car to the end of the driveway and parked, blocking the 4-Runner from leaving. Marckstadt approached the driver of the 4-Runner, who was Perez, smelled alcohol on his breath, and noticed his eyes were red and bloodshot. Marckstadt had Perez step out of the vehicle, patted him down, and placed him in the rear seat of the patrol car. Perez was not handcuffed. Another police officer, Officer Schwacher, was also at the scene. Because Perez spoke only Spanish, Marckstadt called for a Spanish-speaking officer.

At about 7:00 p.m., Santa Ana Police Officer James Berwanger, who spoke Spanish, arrived at the mobilehome. He noticed Perez had red, watery eyes, smelled of alcohol, and spoke with slurred speech. Berwanger, speaking in Spanish, had Perez get out of the patrol car. Berwanger said he was investigating an automobile collision but did not give Perez any details. Perez denied being involved in a collision. Berwanger and Schwacher then went inside Perez's mobilehome to speak with potential witnesses.

4

Inside the mobilehome, Berwanger spoke with Huerta, who said he and Perez had been drinking at Mariscos Ensenada restaurant and Perez had driven home. Berwanger also spoke with Steven Ibarra, Perez's eight-year-old nephew. Ibarra said he had been looking out the window when the 4-Runner "drove up." Perez was the driver and Huerta was the passenger.

After speaking with Huerta and Ibarra, Berwanger returned to Perez, who was standing, without handcuffs, outside the patrol car. When Berwanger asked Perez if he remembered being involved in a collision, Perez replied he had driven home from the Mariscos Ensenada restaurant and did not know whether he had been in a collision. Perez asked if his vehicle had any damage; Berwanger asked Perez to check his vehicle for himself. As Perez walked to the 4-Runner to check for damage, Berwanger noticed he was "unsteady." Berwanger also noticed the 4-Runner had a dent "toward the center of the front bumper." After being shown the dent, Perez denied being involved in a collision.

Berwanger conducted field sobriety tests and determined Perez was under the influence of alcohol, whereupon Perez was arrested and transported to the Santa Ana city jail. Analysis of a blood sample taken from Perez at 8:48 p.m. revealed he had a blood alcohol level of 0.18 percent. At the jail, Perez was taken to an interview room, where a correctional officer, Caroline Contreras, read Perez his rights pursuant to *Miranda* and watched him sign a waiver form.

During an interview with Berwanger, Perez said he and Huerta had been drinking at the Mariscos Ensenada restaurant, admitted driving home from the restaurant, but denied being involved in a collision. When Berwanger told Perez some people had been struck in a collision, Perez acknowledged that Huerta had told him "he had just hit a woman" between the intersection of Fifth Street and Bewley Street and Harbor Boulevard. Perez said he did not realize he had hit a woman, but he believed his friend, Huerta. When asked how he could hit someone with his vehicle without noticing, Perez

5

said he must have been "so drunk." When informed that a small child had been killed in the collision, Perez said that if he had known he hit a child instead of a woman, he would have returned to the scene.

The police impounded Perez's 4-Runner, which had front-end damage consistent with striking a human body.

At trial, Huerta testified he went drinking with Perez on November 9, each drank 10 or 11 bottles of beer, and Perez drove home. Ibarra testified he remembered talking to the police on November 9, but did not remember what he had told them.

The defense called one witness, James Black, an expert examiner of questioned documents. Black compared the signature on the *Miranda* waiver form with exemplars of Perez's signature and concluded Perez did not sign the waiver. Black testified the variation in signatures could be due to intoxication. In rebuttal, the prosecution called a forensic alcohol analyst who testified that alcohol can change the way a person signs his or her name, including spelling.

## DISCUSSION

## I.

### The Trial Court Did Not Err or Violate Perez's Constitutional Rights by Receiving in Evidence Perez's Statements Made During a Field Sobriety Test Conducted Without a *Miranda* Warning.

Perez argues the trial court erred and violated his Fifth Amendment rights under the United States Constitution by receiving in evidence his statements made outside of his home in the evening of November 9, 2011, in particular, the statement that he had driven the 4-Runner home from the Mariscos Ensenada restaurant. Perez argues that statement was inadmissible because he was in custody and had not been provided a *Miranda* warning when he made it. The trial court did not err by denying Perez's motion

6

to exclude and by receiving in evidence Perez's prewarning statements made to Berwanger.

A. *Motion to Exclude Evidence*

     1. *The Motion and the Trial Court's Ruling*

        During pretrial motions, Perez moved to exclude statements he made outside of his home to Berwanger in the evening of November 9, 2011 and statements Perez made later that evening during the interview at the Santa Ana city jail. An evidentiary hearing was conducted, at which Marckstadt and Berwanger testified.

        At the close of the hearing, the trial court denied the motion to exclude evidence. The trial court stated: "The court having considered counsel's arguments, the evidence presented, and the briefing submitted, finds, first off, in relation to the statements attributed to the defendant Perez in the local[ity] of his residence, that those were not custodial, not a custodial interrogation necessitating *Miranda* warnings. I find those statements admissible in this trial. [¶] As to the statements of the defendant at the police station, the court finds that those were given after knowing, intelligent waiver of his constitutional rights and that they were voluntarily made and those statements are also admissible." (Italics added.)

     2. *Marckstadt Testimony*

        Marckstadt testified that on November 9, 2011, as part of an investigation, he was dispatched to an address in Santa Ana, at which he might find the suspect vehicle, a Toyota 4-Runner. He arrived at the address, a mobilehome, about 6:38 p.m. and saw the 4-Runner parked in the driveway. Marckstadt parked his patrol car 15 to 20 yards away, and waited.

        At about 6:50 p.m., Marckstadt saw the reverse lights, headlights, and taillights of the 4-Runner come on. He pulled his patrol car forward, parked behind the 4-Runner, got out of the patrol car, and approached the driver, whom he identified in

court as Perez. Marckstadt testified he could smell alcohol on Perez's breath and Perez's eyes were red, bloodshot, and watery. Because Perez displayed such symptoms of intoxication, Marckstadt asked him to step out of the 4-Runner. Marckstadt did not have his gun drawn. By this time, Schwacher had arrived.

Once Perez was outside of the 4-Runner, Marckstadt patted him down and placed him in the rear seat of the patrol car, the doors of which cannot be opened from the inside. Marckstadt sat in the front seat and, in asking Perez his name, realized he only spoke Spanish. When a Spanish-speaking officer (Berwanger) arrived about five minutes later, Perez was immediately taken out of the patrol car.

3. *Berwanger Testimony*

Berwanger testified that upon arriving at Perez's mobilehome, at about 7:00 p.m., he opened the rear door of the patrol car and had Perez, who was not handcuffed, step out. Speaking in Spanish, Berwanger told Perez the police officers were at his mobilehome to investigate a collision, and probably did not tell him he was a suspect. Berwanger left Perez, who was not handcuffed, with Marckstadt and went inside the mobilehome.

Berwanger returned seven to 10 minutes later and informed Perez, who was standing outside the patrol car, "we were going to proceed with a field sobriety test." Berwanger decided to conduct the field sobriety test because he suspected Perez of driving under the influence. Berwanger testified: "[T]he collision occurred and Officer Marckstadt found the suspect vehicle and saw him backing that suspect vehicle out of the carport, and I also smelled an odor of alcoholic beverage. I noticed his speech appeared slurred, his eyes were red and watery, he exhibited several indicators that I recognized." Berwanger testified he did not have a weapon drawn, and Perez was not handcuffed or restrained and was free to walk about. When Berwanger asked Perez if he had been involved in a collision, he said he had not, but asked if there was damage to his vehicle.

8

Berwanger walked with Perez around the 4-Runner and asked him about a dent in the front.

After discussing the dent, Berwanger and Perez walked back to the patrol car, with Perez walking ahead. As part of the field sobriety test, Berwanger asked Perez a series of standard questions, including if he had driven a car, if he had been drinking that evening, and where he had been drinking. Perez answered that he had driven home after drinking at a restaurant called "Ensenada." After having Perez perform physical tests, Berwanger concluded Perez had been driving while under the influence, placed him under arrest, handcuffed him, and had him transported to the Santa Ana city jail. The time was 8:02 p.m. Neither Berwanger nor any of the other police officers present ever drew a gun.

B. *Perez Was Not in Custody When Questioned Outside His Home.*

1. *Background Law and Standard of Review*

If the police take a suspect into custody and then ask the suspect questions without administering *Miranda* warnings, the suspect's responses cannot be introduced into evidence to establish guilt. (*Berkemer v. McCarty* (1984) 468 U.S. 420, 429 (*Berkemer*). Law enforcement officers are not required, however, to administer *Miranda* warnings to everyone whom they question. (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) Rather, "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" (*Ibid.*; see *People v. Ochoa* (1998) 19 Cal.4th 353, 401 ["'Absent "custodial interrogation," *Miranda* simply does not come into play'"].) For purposes of *Miranda*, a person is in custody when there is "'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citation.]" (*Thompson v. Keohane* (1995) 516 U.S. 99, 112; accord, *People v. Ochoa*, *supra*, at p. 401.) This is an objective test. (*Thompson v. Keohane*, *supra*, at p. 112.)

9

"Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

2. *The* Berkemer *Opinion*

The parties argue at length whether Perez was the subject of a typical traffic stop, and hence subject to *Berkemer*, *supra*, 468 U.S. 420, 440-442, in which the United States Supreme Court held that, during a typical traffic stop conducted by a single police officer, the motorist is not in custody for *Miranda* purposes until placed under arrest. In *Berkemer*, Ohio State Highway Patrol Trooper Williams initiated a traffic stop after seeing a car driven by McCarty weave in and out of traffic. (*Id.* at p. 423.) Williams forced McCarty to stop and get out of his car. (*Ibid.*) Williams noticed McCarty had difficulty standing and decided to charge him with a traffic offense. (*Ibid.*) Without informing McCarty he would be taken into custody, Williams asked him to perform a field sobriety test, commonly called a "'balancing test.'" (*Ibid.*) When McCarty could not perform the test without falling, Williams asked him whether he had been using "intoxicants," and McCarty replied "'he had consumed two beers and had smoked several joints of marijuana a short time before.'" (*Ibid.*) Williams had difficulty understanding McCarty because his speech was slurred. (*Ibid.*) Williams placed McCarty under formal arrest and transported him to the county jail, where Williams resumed questioning without providing *Miranda* warnings. (*Id.* at pp. 423-424.) During questioning, McCarty made incriminating statements. (*Id.* at p. 424.)

10

The Supreme Court held McCarty's postarrest statements were inadmissible because "a person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated in *Miranda*, regardless of the nature or severity of the offense of which he is suspected or for which he was arrested." (*Berkemer*, *supra*, 468 U.S. at p. 434, fn. omitted.) The Supreme Court also held McCarty's prearrest statements made during the roadside interrogation were admissible because questioning during a typical traffic stop does not constitute a custodial interrogation subject to *Miranda*. (*Berkemer*, *supra*, at pp. 435, 442.)

The court explained that "[t]wo features of an ordinary traffic stop mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'" (*Berkemer*, *supra*, 468 U.S. at p. 437.) First, a typical traffic stop is "presumptively temporary and brief," and "[a] motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way." (*Ibid.*) Second, during a typical traffic stop, the motorist does not feel "completely at the mercy of the police." (*Id.* at p. 438.) The typical traffic stop is public, and "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." (*Ibid.*) In addition, the fact "the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability." (*Ibid.*)

3. *Perez Was Questioned During the Equivalent of a Traffic Stop.*

There are, to be sure, both similarities and distinctions between a typical traffic stop described in *Berkemer* and the detention of Perez made outside his mobilehome. But on balance, under the undisputed facts, Perez's detention was sufficiently analogous to a typical traffic stop that *Miranda* warnings were not required.

11

Perez was suspected of driving a motor vehicle while intoxicated. Marckstadt initiated a vehicle stop, similar in nature to a traffic stop, when Perez started to back his 4-Runner out of the driveway of his mobilehome. Although Perez was not stopped on a public roadway, he was stopped within a mobilehome park, which would have greater exposure to the public view than many highways and roads. It is true that Perez could not "continue on his way" (*Berkemer*, *supra*, 468 U.S. at p. 437) in the 4-Runner because his driveway was blocked by Marckstadt's patrol car, but in *Berkemer*, *supra*, 468 U.S. at page 436, the Supreme Court recognized that few motorists would feel they could leave the scene of a typical traffic stop, and, in some states, it is a crime to do so.

Berwanger told Perez the police officers were at his mobilehome to investigate a collision, and probably did not tell him he was a suspect. Although Perez's detention was considerably longer than the "presumptively temporary and brief" traffic stop anticipated by *Berkemer*, *supra*, 468 U.S. at page 437, some period of time was spent waiting for a Spanish-speaking officer to arrive and more time was spent inspecting the damage to Perez's 4-Runner. Although three officers were present, rather than one or two as in the typical traffic stop, a third, Spanish-speaking, officer was necessary to communicate with Perez. Only Berwanger questioned Perez, and Berwanger did not conduct a lengthy stationhouse-style interrogation. Instead, Berwanger conducted a standard field sobriety test, just as in *Berkemer*, and asked Perez questions from the standard form.

While waiting for Berwanger to arrive, Perez was placed in the backseat of the patrol car. "But we need not decide whether [Perez] was in custody when he was in the backseat of the patrol car, because he was not questioned during that time. Even were we to conclude that [Perez] was in custody when he was detained in the patrol car, it does not necessarily follow that he remained in custody when he was released from the vehicle before he was interviewed." (*People v. Thomas* (2011) 51 Cal.4th 449, 477.)

12

Once out of the patrol car, Perez had far greater freedom of movement than a motorist in a typical traffic stop. Not only was Perez unrestrained and free to walk about, but, unlike a motorist in a typical traffic stop, he could have walked back into his home. Perez was never handcuffed before his arrest, never told he could not leave, and never told he was a suspect.[3] The police officers never drew weapons, Berwanger was not aggressive or confrontational in his questioning, and Perez was cooperative in providing information. "Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest." (*Berkemer*, *supra*, 468 U.S. at p. 442.)

Whether or not Perez's detention outside of his mobilehome could be labeled a typical traffic stop, the fundamental and ultimate question is whether a reasonable person in the Perez's position would believe there had been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. (*Thompson v. Keohane*, *supra*, 516 U.S. at p. 112; *People v. Ochoa*, *supra*, 19 Cal.4th at p. 402; see *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403 ["Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest?"].) Case law has identified numerous circumstances, no one of which is dispositive, to consider in making this determination. (*People v. Pilster*, *supra*, at pp. 1403-1404; *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.) Having considered the totality of the circumstances,[4] and for the reasons we have explained, we conclude a reasonable

___

[3] Although Berwanger testified he believed Perez was a suspect in the collision before interviewing him outside his mobilehome, a police officer's undisclosed, subjective belief that the person being questioned is a suspect is irrelevant to objective "in custody" determination. (*Stansbury v. California* (1994) 511 U.S. 318, 322-324.) "A policeman's unarticulated plan has no bearing on the question whether a subject was 'in custody' at a particular time; the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood the situation." (*Berkemer*, *supra*, 468 U.S. at p. 442.)

[4] In *People v. Aguilera*, *supra*, 51 Cal.App.4th at page 1162, the court listed the circumstances as including: "[W]hether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the

13

person in Perez's position would not have believed there had been either a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. Because Perez was not in custody when he spoke with Berwanger outside of the mobilehome, there was no *Miranda* violation, and Perez's statements were admissible.

## C. *Harmless Error*

Even if a *Miranda* violation occurred, admission of Perez's prewarning statements was harmless. Admission in evidence of statements obtained in violation of *Miranda* is subject to the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), which requires the error to be harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310; *People v. Neal* (2003) 31 Cal.4th 63, 86.) Under the *Chapman* test, error is harmless when it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, at p. 24.) "*Chapman* . . . made clear that 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' The Court has the power to review the record *de novo* in order to determine an error's harmlessness. [Citations.] In so doing, it must be determined whether the State has met its burden of demonstrating that the admission of the confession to [Berwanger] did not contribute to [Perez]'s conviction. [Citation.]" (*Arizona v. Fulminante*, *supra*, at pp. 295-296.)

---

person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation."

"'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" (*People v. Neal*, *supra*, 31 Cal.4th at p. 86, quoting *Yates v. Evatt* (1991) 500 U.S. 391, 403.) "Thus, the focus is what the jury actually decided and whether the error might have tainted its decision." (*People v. Neal*, *supra*, at p. 86.)

Our de novo review of the record leads us to conclude that if the trial court erred by receiving in evidence Perez's prewarning statements, that error was unimportant in relation to the overwhelming evidence establishing Perez was the driver of the 4-Runner that struck Romero and killed Darwin. This evidence includes:

1. Montoya, a waitress at the Mariscos Ensenada restaurant, testified she saw two men leave the restaurant, get into a vehicle, and drive away, and the shorter of the two men, Perez, was driving.

2. When Romero was struck and thrust onto the hood of the 4-Runner, she could see the driver, whom she described as light-skinned with a mole-like spot on the side of his face between his lip and his nose. Perez's booking photograph showed that he is light-skinned and has a small mole between his lip and his nose.

3. Huerta testified he was in the passenger seat and Perez was the driver on the return home from the Mariscos Ensenada restaurant. Perez argues Huerta had reason to pin the blame on Perez; however, Huerta also testified he did not want his friend, Perez, to "get into any trouble." The jury, which asked during deliberations to have Huerta's testimony read back, weighed and evaluated Huerta's credibility.

4. Perez was the registered owner of the 4-Runner. A reasonable inference is the owner of the vehicle was also the driver.

5. At the Santa Ana city jail, after being given oral *Miranda* warnings and signing a waiver, Perez stated he had driven the 4-Runner home from the Mariscos

15

Ensenada restaurant. The jury did not believe Black's testimony that Perez did not sign the waiver.

There was no evidence presented—none whatsoever—that Huerta, not Perez, was the driver of the 4-Runner. It is beyond a reasonable doubt that any *Miranda* violation occurring before Perez was arrested did not contribute to the verdict.

## II.

### Perez's Trial Counsel Was Not Ineffective by Failing to Object to Admission of Perez's Postarrest Statements Made During the Police Interview in the Jail.

Perez argues his trial counsel was ineffective by failing to object, based on *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*), to his statements made during the postarrest jail interview on the ground police officers used a two-step interrogation strategy. Perez's trial counsel was not ineffective because such an objection would have had no merit.

A. *Background*

During the hearing on Perez's motion to exclude evidence, Berwanger testified he arrested Perez at 8:02 p.m. on November 9, 2011. Perez was transported to the Santa Ana city jail. There, he was placed in an interview room, where his handcuffs were removed and a technician drew a blood sample from him.[5] Contreras gave Perez an oral *Miranda* warning in Spanish, and he signed a waiver form.

After being advised of his rights pursuant to *Miranda*, Perez agreed to speak with Berwanger, who asked open-ended questions to establish a chronology of events. Perez again stated he drove his 4-Runner home from the Mariscos Ensenada restaurant and continued to deny knowing that he had hit a pedestrian. Perez said the

---

[5] At trial, Berwanger testified the blood sample was drawn at 8:48 p.m.

16

passenger, Huerta, told him he had hit a woman. Perez was coherent and responsive to questions throughout the interrogation, which lasted about 20 minutes.

B. *The* Seibert *Opinion*

In *Seibert*, *supra*, 542 U.S. 600, the United States Supreme Court addressed a police protocol for a two-step interrogation of suspects. In the first step of such an interrogation, police officers deliberately provide no *Miranda* warning and conduct a custodial interrogation until a confession is produced. (*Id.* at p. 604.) In the second step, the police officers, knowing the confession would be inadmissible, provide *Miranda* warnings and conduct a second interrogation that leads the suspect to make the same confession that was produced by the first interrogation. (*Ibid.*) The question in *Seibert* was the admissibility of the second confession. (*Ibid.*)

The facts of *Seibert* are as follows. The defendant's 12-year-old son, Jonathan, who suffered from cerebral palsy, died in his sleep. (*Seibert*, *supra*, 542 U.S. at p. 604.) The defendant was afraid of being charged with neglect because there were bedsores on Jonathan's body. (*Ibid.*) The defendant, two of her teenage sons, and two of her sons' friends decided to incinerate Jonathan's body while burning down the family's mobilehome. (*Ibid.*) Donald, a mentally ill teenager living with the family, was left in the home when the fire was set to avoid the appearance Jonathan had been left alone. (*Ibid.*)

Five days later, police officers awakened the defendant in the middle of the night at a hospital, where one of her sons was being treated for burns suffered while setting the fire. (*Seibert*, *supra*, 542 U.S. at p. 604.) The defendant was taken to the police station, left alone in an interview room for 15 to 20 minutes, and then questioned for 30 to 40 minutes by a police officer who squeezed her arm and repeatedly said, "'Donald was also to die in his sleep.'" (*Id.* at pp. 604-605.) After the defendant admitted she knew Donald would die in the fire, the police officer gave her a 20-minute

17

break before providing her *Miranda* warnings and resuming the interrogation. (*Id.* at p. 605.) During the second part of the interrogation, the police officer confronted the defendant with her prewarning statements and thereby was able to extract more confessions from her. (*Ibid.*) At a hearing on the defendant's motion to suppress, the interrogating officer admitted, "he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" (*Id.* at pp. 605-606.) The officer acknowledged the defendant's ultimate statement was "'largely a repeat of information . . . obtained' prior to the warning. . . ." (*Id.* at p. 606.)

A divided Supreme Court held the defendant's postwarning statements were inadmissible. (*Seibert*, *supra*, 542 U.S. at p. 617 (plur. opn. of Souter, J.); *id.* at p. 622 (conc. opn. of Kennedy, J.).) The plurality opinion, authored by Justice Souter, focused on whether the midstream *Miranda* warning "could function 'effectively' as *Miranda* requires." (*Id.* at pp. 611-612.) The plurality opinion concluded: "Because the question-first tactic effectively threatens to thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted, and because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose, [the defendant]'s postwarning statements are inadmissible." (*Id.* at p. 617.)

Justice Kennedy authored a concurring opinion expressing the view that the plurality opinion's approach was too broad and would apply to both intentional and unintentional two-stage interrogations. (*Seibert*, *supra*, 542 U.S. at pp. 621-622 (conc. opn. of Kennedy, J.).) Justice Kennedy concluded, "I would apply a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." (*Id.* at p. 622 (conc. opn. of Kennedy, J.).) Justice Kennedy proposed this test: "If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of

18

prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." (*Ibid.*)  Such curative measures "should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." (*Ibid.*)  Two examples of curative measures were offered.  First, "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." (*Ibid.*)  Second, and alternatively, "an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." (*Ibid.*)

The concurring opinion of Justice Kennedy is considered to represent the *Seibert* holding because he "'concurred in the judgment[] on the narrowest grounds' [citation]." (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1370, quoting *Marks v. United States* (1977) 430 U.S. 188, 193.)

C.  *A* Seibert *Objection Would Have Had No Merit.*

To prevail on a claim of ineffective assistance of counsel, the defendant must prove (1) his or her attorney's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional standards; and (2) his or her attorney's deficient representation subjected him or her to prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Cain* (1995) 10 Cal.4th 1, 28.)  Counsel is not required to make futile objections or advance meritless arguments. (*People v. Anderson* (2001) 25 Cal.4th 543, 587; *People v. Cudjo* (1993) 6 Cal.4th 585, 616; *People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile"].)

An objection based on *Seibert* by Perez's trial counsel would have been to no avail. This case, unlike *Seibert*, does not involve a two-step interrogation. As we concluded above, Perez's prewarning statements were admissible because they were not obtained in a custodial interrogation. Before arresting Perez, Berwanger conducted a standard field sobriety test, which included questions, taken directly from a form, asking Perez whether he had been drinking and whether he had been driving. Berwanger did not engage in the aggressive, accusatory questioning style used by the interrogating officer in *Seibert*. When interviewing Perez at the jail, Berwanger did not confront him with his prewarning statements, but asked open-ended questions designed to create a chronology of events.

Even if the prewarning questioning of Perez could be considered the first step in a deliberate two-step interrogation process, curative measures ensured a reasonable person in Perez's situation would have understood the import and effect of the *Miranda* warning. Perez was arrested at 8:02 p.m. in front of his mobilehome. He was transported to the Santa Ana city jail and taken to an interview room, where his blood was drawn at 8:48 p.m., over 45 minutes after his arrest. He was given an oral *Miranda* warning and signed a written waiver. Thus, there was a "substantial break in time and circumstances" (*Seibert*, *supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.)) between Perez's prewarning statements and postwarning statements. Because an objection based on *Seibert* decidedly would have had no merit, Perez's trial counsel was not ineffective for failing to make one.

## III.

### Admission of Hearsay Statements Made by Huerta and Ibarra Was Harmless.

A. *Background*

Perez argues his trial counsel was ineffective by failing to pose hearsay objections (or move to strike testimony) in the following three situations:

20

1.  Huerta testified he spoke with police officers on November 9, 2011. The prosecutor asked Huerta, "[a]nd you indicated to them that he [(Perez)] had driven his car home from the restaurant, correct?" Defense counsel interposed an objection, which the trial court sustained. The prosecutor then asked, "[d]id you tell the police who drove you home from the restaurant?" Huerta answered, "[y]es." The prosecutor asked, "did you tell them it was Mr. Perez?" No objection was made, and Huerta answered, "[y]es."

2.  On November 9, 2011, Berwanger entered Perez's mobilehome and spoke with Huerta. Berwanger testified: "When I spoke to [Huerta], he told me that [Perez] was driving and did the driving from, actually had been driving the vehicle that day and had been driving from the Ensenada bar." Defense counsel did not pose an objection to or move to strike the testimony.

3.  Perez's nephew, Ibarra, testified he remembered talking to a police officer on November 9, 2011. When asked if he remembered what he had told the police officer, Ibarra testified he did not remember what he had said, but he knew he had told the truth. This exchange followed:

"Q.  [(the prosecutor)] Okay. Do you remember telling a police officer that you saw your uncle drive home in his car that day?

"A.  [(Ibarra)] I don't remember.

"Q.  . . . Do you remember seeing your uncle come home in that car before you talked to the police officer?

"A.  I did see him come home but I don't know which side he was in.

"Q.  Can you say that louder?

"A.  He came home, but I . . . don't know which side he came in."
(Boldface omitted.)

The prosecutor recalled Berwanger to the stand and asked him what Ibarra had told him on November 9, 2011. Berwanger testified that Ibarra had said "he was

21

looking out the window when the defendant drove up . . . . He said the defendant, Mr. Perez, was driving the vehicle." Berwanger further testified: "[Ibarra] stated his uncle [(Perez)] was the one driving and then he also stated that . . . Huerta was the passenger." Defense counsel did not object to or move to strike any of this testimony.

B. *No Prejudice*

The Attorney General agrees with Perez that "Huerta's out-of-court statements were hearsay not subject to any exception." For purposes of analysis, we too will treat them as such. We do not address whether counsel's representation was deficient because we conclude Perez suffered no prejudice. (*Strickland*, *supra*, 466 U.S. at p. 697 ["a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

Prejudice necessary to establish ineffective assistance of counsel means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694; *People v. Salcido* (2008) 44 Cal.4th 93, 170.) A reasonable probability means a "probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, at p. 694.)

There is no reasonable probability the outcome at trial would have been different if Perez's trial counsel had objected to (or had moved to strike) Huerta's statements described above. At trial, Huerta testified directly and unequivocally that he was in the passenger seat and Perez drove home from the Mariscos Ensenada restaurant. Huerta so testified before testifying about what he had told the police on November 9 and before Berwanger testified at trial. Perez challenges Huerta's credibility, but the jury already has considered Huerta's credibility, and we are bound by the jury's determination. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Significantly, there was

22

a wealth of evidence at trial establishing that Perez was the driver, and no evidence whatsoever that Huerta was the driver.

The Attorney General argues that evidence of Ibarra's statements made to Berwanger was admissible under Evidence Code section 1235 (prior inconsistent statements). We do not address that argument because, for reasons we have explained, there was no reasonable probability the outcome at trial would have been different if Perez's trial counsel had successfully excluded Berwanger's testimony about statements made by Ibarra.

## IV.

### There Was No Cumulative Error.

Perez argues cumulative error. The only potential error we have found was his trial counsel's failure to pose hearsay objections or move to strike a few portions of Huerta's testimony and Berwanger's testimony. Perez suffered no prejudice from counsel's performance. Accordingly, there can be no cumulative error. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.)

## V.

### Perez's Absence from the Readback of Witness Testimony Was Harmless.

Perez argues he was denied his statutory right to be present for readback of witness testimony during jury deliberations. Although Perez orally waived his right to be present, he argues the trial court's failure to secure a written waiver compels reversal.

At the outset of jury deliberations, Perez's trial counsel announced that Perez wanted to waive his right to be present during any readback of witness testimony. The trial court then stated: "Mr. Perez, I want to make sure that you understand that . . . [i]f they should request the read back of any witness, you've the right to have that done

23

here in open court in your presence." The court explained that, instead of reading back testimony in open court, the court reporter would be sent into the jury room to read back the appropriate testimony. The court informed Perez the court reporter would be under strict orders just to read back the testimony and not to communicate with the jurors. The court asked Perez, "[i]s that latter procedure acceptable to you?" He responded, "[y]es." The court then asked Perez, "[y]ou're willing to waive your right to be personally present during the read back of any testimony?" He again answered, "[y]es."

During deliberations, the jury asked for a readback of Huerta's testimony and Contreras's testimony. The court minutes reflect the court reporter spent about 30 minutes in the jury room reading back testimony.

Perez's absence from the readback of witness testimony violated Penal Code section 977, subdivision (b)(1), which provides that an accused has a right to be present during the trial of a felony charge, "unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present." Such error is statutory only and "'thus "is reversible only if it is reasonably probable the result would have been more favorable to defendant absent the error." [Citation.]'" (*People v. Avila* (2006) 38 Cal.4th 491, 598.)

Here, Perez's absence from the readback of witness testimony and the trial court's failure to secure a written waiver from Perez were harmless in two ways. First, Perez orally waived his right to be present during any readback of testimony after the trial court explained to him the alternate readback procedures. The absence of a written waiver could not have affected the outcome because "the record makes clear that [Perez] voluntarily waived his right to be present, if only orally." (*People v. Huggins* (2006) 38 Cal.4th 175, 203.)

Second, Perez does not show that his personal presence during the readback of testimony would have affected the outcome of trial. The burden of establishing prejudice lies with the defendant. (*People v. Garrison* (1989) 47 Cal.3d 746, 783.) Perez

24

concedes he cannot make such a showing because "[n]o one was present to ensure the court reporter's accuracy during readback, or that the correct testimony was read." The rereading of testimony is, however, "not a critical stage of the proceedings." (*People v. Ayala* (2000) 23 Cal.4th 225, 288.) "Because [Perez] provides no basis on which we could conclude the result of his trial would have been different had he been present at the readback [citation], we find the violation of [Penal Code] section 977 was harmless." (*People v. Avila*, *supra*, 38 Cal.4th at p. 598.)

"Absent assertion of any theory of prejudice and in view of the clear, albeit oral, waiver, we find no basis for reversal." (*People v. Garrison*, *supra*, 47 Cal.3d at p. 783.)

## DISPOSITION

The judgment is affirmed.

FYBEL, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

IKOLA, J.